Alan Ellis, Esquire
Mark H. Allenbaugh, Esquire
Law Offices of Alan Ellis
80 Pinheiro Circle
Novato, CA 94945
415-895-5076
415-493-6391 Fax
AELaw1@alanellis.com

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:11-cr-00291 |
|     Plaintiff, | JUDGE WILLIAM B. SHUBB |
|     vs. | **DEFENDANT'S MEMORANDUM IN AID OF SENTENCING** |
| WALTER DANIEL OLMSTEAD, | |
|     Defendant. | |

NOW COMES Defendant WALTER DANIEL OLMSTEAD, by and through counsel, and pursuant to this Court's Order of August 23, 2016 and Local Rule 460(j), provides this Court with a Memorandum in Aid of Sentencing.

**<u>TABLE OF CONTENTS</u>**

Table of Auhtorities........................................... 3

Summary....................................................... 4

I.  Brief Factual Background ................................. 6

II.  Motion for Downward Variance for Mitigating Role........ 11

III.  Mr. Olmstead is not the Typical "CHC IV" Defendant ..... 13

IV.  A Stastical Review of Sentences under USSG §2R1.1........ 14

V.  Collateral Consequences................................... 15

VI.  Alternatives to Incarceration........................... 16

Conclusion.................................................... 17


Exhibit A - The SCRAM Intercept Program

Exhibit B - Criminal History Score Charts


Certificate of Service

2

## TABLE OF AUTHORITIES

**Cases**

*United States v. Quintero*-Leyva, 823 F.3d 519(9th Cir. 2016).. 12

**Other Authorities**

American Bar Assoc., *National Inventory of the Collateral
   Consequences of Conviction* ................................. 16

U.S. Sentencing Comm'n, *Alternative Sentencing in the Federal
   Criminal Justice System* (2009) ........................... 17

U.S. Sentencing Comm'n, *Proposed Priorities for Amendment Cycle
   Ending May 1, 2017* ....................................... 17

U.S. Sentencing Comm'n, Interactive Sourcebook................ 13

U.S. Sentencing Comm'n, Datafiles........................... 14

**U.S. Sentencing Guidelines**

USSG §2R1.1...................................... 2, 14, 15, 19

USSG §3B1.2....................................... 10, 11, 13

USSG §4A1.3............................................. 14

USSG §5C1.1............................................. 20

USSG §5K1.1....................................... 6, 13, 14

USSG App. C., Amend. 794................................. 13

## SUMMARY

It is respectfully recommended that this Court impose a split sentence of five months' incarceration followed by three years' supervised release conditioned upon five months' home confinement.  While on supervised release, Mr. Olmstead shall participate in intensive drug and alcohol treatment, supervision, testing,[1] community service and the payment of restitution.[2]

As the table below illustrates, Mr. Olmstead was a relatively minor player in the overall bid-rigging scheme. His involvement was short-lived from November 2008 to July 2009. He left the conspiracy well before he knew he was under investigation and immediately began cooperating with the FBI. But for Mr. Olmstead's alcoholism and subsequent DUIs, his guideline sentencing range would be significantly lower.

---

[1] Mr. Olmstead has been accepted in the SCRAM-Intercept program to be paid by him.  *See* www.scramsystems.com.  This program is a well-established and well-recognized program which requires the participant to wear an ankle bracelet 24/7 which detects any alcohol in his system.  If alcohol is detected, immediate measures are sent to the program which, in turn, notifies the supervising authority (here, U.S. Probation).  Exhibit A.

[2] The Plea Agreement provides that Mr. Olmstead "agrees to pay a criminal fine of $20,000 *if so ordered by the Court*."  Plea Agreement at 6 (emphasis added).  The PSR does not recommend a fine inasmuch as "[t]he defendant is dissolving his company due to the instant offense. Based on his limited assets, limited monthly cash flow, and his anticipated unemployment, it appears he will be unable to pay a fine."  PSR at 18, ¶ 95.  Mr. Olmstead has placed in the undersigned's trust account $12,000 for immediate payment toward the agreed upon amount of restitution, which was stipulated to be $31,000 in the plea agreement.  *See* Plea Agreement at 3.  While the government contends that Mr. Olmstead's total restitution should be $29,687.34, Mr. Olmstead's records indicate that only $26,087.34 may be due.  In any event, Mr. Olmstead requests no fine be imposed and a payment plan for the remaining balance in restitution be made a condition of his supervised release.  We are confident this can be resolved prior to sentencing.

4

| Defendant | Payoff |
|---|---|
| Katakis | ? |
| Parker | ? |
| Swanger | $406,404.81 |
| Chandler | $307,491.30 |
| Northcutt | $307,491.30 |
| Ghio | $271,454.43 |
| Vanzetti | $214,544.00 |
| Hutz | $119,307.00 |
| Joachim | $111,987.71 |
| Marifat | $85,964.48 |
| Rose | $46,750.00 |
| Olmstead | $29,687.34 |
| Jackson | $20,000.00 |
| **Average** | $174,722.46 |
| **Total Payoff** | $1,921,947.03 |

The Presentence Investigation Report ("PSR") calculates Mr. Olmstead's Total Offense Level to be 13 and his Criminal History Category to be IV, which equates to an advisory sentencing range of 24-30 months in Zone D. The PSR recommends a sentence of 24 months' imprisonment, three years' supervised release, no fine, and a to-be-determined amount of restitution. With respect to the imprisonment recommendation, such a sentence punishes Mr. Olmstead for his DUIs resulting from his addiction to alcohol, and is unwarrantedly disparate with respect to the recommended sentences of far more culpable co-defendants in this case.

Due to Mr. Olmstead's minor role in the bid-rigging conspiracy, this Court should vary downward by two-levels. With

5

just the two-level downward variance for his minor role, Mr. Olmstead's revised Total of Offense Level would be 11.[3]

Due to Mr. Olmstead's cooperation, Mr. Olmstead has been informed that the Government will move for a modest departure of three months pursuant to USSG §5K1.1.

While Mr. Olmstead's four misdemeanor prior convictions for Driving Under the Influence (DUI) resulted in a Criminal History Category ("CHC") of IV, Mr. Olmstead is far from a typical CHC IV offender.   Accordingly, this Court should vary downward by reducing Mr. Olmstead's CHC to CHC III if not a II. A Total Offense Level (TOL) of 13 in CHC II equates to an advisory sentencing range of 10-16 months in Zone C before any USSC 5K1.1 substantial assistance departure.   A TOL of 11 in CHC II equates to 12-18 months before any such departure.

Despite his valiant efforts to get on with his life, the unfortunate harsh effect of the last seven years awaiting sentencing not of his making has taken its toll on Mr. Olmstead.

## I.    BRIEF FACTUAL BACKGROUND

Mr. Olmstead is 44 years old, college educated, and unmarried with no children.   Before becoming a real estate investor, he was a race car driver. Seven years ago, Mr. Olmstead

---

[3] Counsel is mindful that there was no stipulation in the plea agreement for a Minor Role. Critically, Mr. Olmstead pleaded guilty over four years before the November 1, 2015 amendment to the guidelines clarifying those

began attending public real estate foreclosure auctions in San Joaquin County.  *See* PSR at 9.  As others who attend such auctions and invest in real estate, it was his intention to purchase foreclosed properties at low prices and "flip" them for a profit, which he would share with his investors.

Mr. Olmstead's offense conduct took place between November 2008 and July 2009.  At the auctions, Mr. Olmstead observed a group of men who appeared to have a close working relationship with the auction crier. They mostly purchased Stockton area homes, but appeared to be scrutinizing Mr. Olmstead's activities regarding Tracy properties. It took a while for the group to understand that Mr. Olmstead was building a successful business. Things then began to happen, quickly. The auction crier, without notice, would change the physical location of the auctions. He then sometimes made it difficult for Mr. Olmstead to complete a transaction after the auction. Mr. Olmstead also noticed that the group of men he previously had observed had information about him and his business that could only have come from the crier. Towards the end of 2008, members of the group approached Mr. Olmstead and threatened him that they were "going to deal with you." Mr. Olmstead felt intimidated.

At one point a man named Rick Northcutt approached Mr. Olmstead and stated explicitly: "You're going to deal through

---

instances in which a defendant should be given a downward adjustment for minor or minimal role.

us." At first Mr. Olmstead did not understand what he meant. Mr. Olmstead indicated that the physical pace of his work was getting to him. He had sustained injuries to both knees while racing and his knees began giving him trouble. He was in constant pain. He began taking more pain medication and admitted that his prescriptions were insufficient to sustain him, so he purchased Vicodin and other pain medication on the "street." He now realizes that the medication he was taking, as well as his increased use of alcohol, affected his judgment.

Fearing the adverse impact the group of men would have on his business and on him personally, as well as feeling protective of the investor's money he obtained, Mr. Olmstead approached the group and asked, "Why don't we work something out?" Their response was "You do everything through us."

Mr. Olmstead continued to identify good properties in Tracy, but now had to report his findings to the group, as well as pay them a commission on his deals. In exchange, they invited him to attend the secondary auctions that they staged. The process was essentially that the group would obtain, with the crier's collusion, properties at a reduced price. The group would then stage their own "auctions," allowing one member to purchase the property and the rest of the group sharing in the profits.

Realizing what he was doing was wrong and that he had gotten in over his head, on July 21, 2009, he stopped dealing with the group altogether. Meanwhile or thereafter, an FBI investigation

was initiated, which Mr. Olmstead did not learn about until well after he had ceased his involvement.  When contacted by the FBI, he immediately began cooperating.

Mr. Olmstead's original intention was to legitimately develop a business in a very difficult business environment. His plan was working. His business was successful, which brought him to the attention of "The Group," who were engaged in rigging the property auction process. Mr. Olmstead was threatened by individuals who were engaged in the bid-rigging and fraud, and who would not tolerate anyone else in their business world. *See* PSR at 6 ("In order to keep outside bidders from competing and driving prices up, the Group tried to get the other bidders to go away or join in their scheme by telling them to either cooperate or take their business elsewhere.").  He was physically threatened and followed by "goons" hired by Rick Northcutt and Wiley Chandler.

In hindsight, Mr. Olmstead acknowledges that he should then have gone to the authorities. However, he was frightened and compromised by his own substance abuse problems. All he could see was the loss of his business and thus the loss of the capital entrusted to him by others. He made the wrong choice and succumbed to the threats by starting to participate in the bid rigging and fraud.

Mr. Olmstead only lost his way for a relatively brief time; however, realizing after just a short time in the scheme that he

could not continue.  He had exceedingly little involvement in the overall scope of the criminal big-rigging conspiracy; a conspiracy he joined under duress, engaged in for a very short period of time, profited relatively little, and voluntary left the conspiracy prior to becoming aware of the investigation.

As the Commission notes in light of a November 1, 2015 amendment, with respect to applying the downward adjustment at USSG §3B1.2, "a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline."  USSG §3B1.2, comment. (n.3(C)). Likewise, "[t]he fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative. Such a defendant may receive an adjustment under this guideline if he or she is substantially less culpable than the average participant in the criminal activity." *Id.*

According to the Government' Formal Objection and Response to the PSR, Mr. Olmstead netted a total of $30,552, (Doc. 49 at 2), now revised to $29,687.34 although Mr. Olmstead's records indicate he received no more than $26,087.34.  As the table in the executive summary above illustrated, this payoff amount constituted but a very small percentage (1.27% to be exact) of the total payoffs received by all co-defendants, which does not include the (currently unknown) payoff amounts received by co-defendants Katakis and Parker.  In fact, Mr. Olmstead's payoff is

the second lowest payoff amount of all co-defendants, and is well below the average payoff of $174,722.46.

## II.  MOTION FOR DOWNWARD VARIANCE FOR MITIGATING ROLE

Mr. Olmstead incorporates herein by reference his argument set forth in his Formal Objections to the PSR (Doc. 49) that, especially in light of the U.S. Sentencing Commission's recent Amendment to USSG §3B1.2 (effective November 1, 2015), this Court should vary downward by at least two levels for his minor role in the offense conduct.

The Probation Office declined to make this adjustment because "Mr. Olmstead understood the scope and structure of the bid rigging, he attended multiple sessions of the auction led by the 'Group', and he bought a large number of properties (45) from November 2008 to July 2009."  (Doc. 44-4 at 2).

As the Ninth Circuit recently held,

> The Amendment [to USSG §3B1.2] makes clear that a district court should consider all of the factors set forth in the Amendment. Once the court has considered all the factors, however, it may grant or deny a reduction even if some of the factors weigh toward the opposite result. A district court, therefore, may grant a minor role reduction even if some of the factors weigh against doing so, and it may deny a minor role reduction even if some of the factors weigh in favor of granting a reduction. And because the factors set forth in the Amendment are non-exhaustive, a district court may also consider other reasons for granting or denying a minor role reduction.

11

*United States v. Quintero*-Leyva, 823 F.3d 519, 524 (9th Cir. 2016).   Merely because Mr. Olmstead understood the scope and structure of the bid-rigging is, at most, a neutral factor with regard to his relative culpability.   Further, that he attended multiple auction sessions is greatly mitigated by the relatively short period of time he did attend those, which the PSR itself identifies as a mere two months.   *See* PSR at 9, ¶ 34 ("Olmstead participated in many round-robin auctions in June and July 2009.")   He also voluntarily withdrew from the conspiracy prior to contact with law enforcement.   Finally, while he was involved with 45 properties,[4] this fact is overstated by the very small payout he received relative to the entire conspiracy—a mere 1.27% of the total payoffs (not including the payoffs received by Katakis and Parker).   That, coupled with the fact that he received the second lowest payoffs is a true measure of Mr. Olmstead's relatively minor culpability.

As the Commission has recognized, this adjustment has not been granted in enough cases and certainly not in cases where it should have been.   *See Quintero-Leyva*, 823 F.3d at 523 ("The Amendment changed language that 'may have had the unintended effect of discouraging courts from applying the mitigating role

---

[4] It is not at all clear from the evidence the government provided to counsel that there were 45 properties as part of Mr. Olmstead's offense conduct. The government's evidence in support of restitution list only 12 properties, for example.

adjustment in otherwise appropriate circumstances.'") (Quoting USSG App. C., Amend. 794).

Mr. Olmstead's case is precisely the type of case that the Commission envisioned warrants a variance, which the Commission also believes should be more liberally and frequently granted.

### III. MR. OLMSTEAD IS NOT THE TYPICAL "CHC IV" DEFENDANT

Mr. Olmstead incorporates herein by reference his argument set forth in his Formal Objections to the PSR (Doc. 49) that his this Court should reduce his Criminal History Category inasmuch as he is far from the typical CHC IV defendant. This Court should find that Mr. Olmstead's CHC is at worst III, if not a II.

As noted therein, the typical offender in CHC IV generally includes *violent* recidivists convicted of *violent* offenses. According to the U.S. Sentencing Commission's Interactive Sourcebook available at isb.ussc.gov, for all fraud offenders (the most similar to antitrust offenders, which do not have their own chart available) between 2006 and 2014, only 4.1% were in Criminal History Category IV. *See* Exhibit B (attached). In contrast, 8.3% of Assault cases were in CHC IV, as were 8.8% of Racketeering cases, 11.4% of Robbery cases, 11.5% of Burglary, and 15.7% of Firearms cases. *See id.*

Notably, with the exclusion of a non-countable 1990 misdemeanor theft conviction in Sacramento County Municipal

Court, at the age of 18, none of Mr. Olmstead's priors involved

dishonesty.  Section 4A1.3 provides:

> If reliable information indicates that the
> defendant's criminal history category
> substantially over-represents the seriousness
> of the defendant's criminal history <u>or the
> likelihood that the defendant will commit
> other crimes, a downward departure may be
> warranted</u>. (Emphasis added).

### IV.  A STATISTICAL REVIEW OF SENTENCES UNDER USSG §2R1.1

Counsel canvassed the U.S. Sentencing Commission's publicly

available sentencing datafiles, which are available at

http://www.ussc.gov/research-and-publications/commission-

datafiles. Specifically, the datafiles covering fiscal years 2006

through 2015 were reviewed.  Of the over three-quarters of a

million defendants sentenced under the guidelines during that

period of time, exactly 109 individuals were sentenced under USSG

§2R1.1.  Of those 109 individuals, exactly 100 pleaded guilty.

Of those 100, the average sentence was 7.7 months and the median

sentence was five months.  A sentence of 24 months, as

recommended by the Probation Office, is in the 94th percentile,

meaning a 24-month sentence is greater than 94% of all other

offenders in this group, i.e., those sentenced under USSG §2R1.1

who pleaded guilty.

The sentencing factor driving Mr. Olmstead's sentence is, of

course, his criminal history.  Since 2006, no one has scored

higher than Criminal History Category II, and there were only two such individuals.  Mr. Olmstead is *sui generis*.

Since 2006, there were 20 such individuals sentenced under USSG §2R1.1 who pleaded guilty and had a TOL of 13.  All of these individuals were in CHC I.  The average sentence for those with a TOL of 13 in CHC I who pleaded guilty was 2 months and the median was straight probation.

If Mr. Olmstead's TOL is determined to be no more than 11, then his advisory sentencing range at CHS II is only 8-14 months in Zone B before any §5K1.1 substantial assistance reduction. There have been 12 such individuals sentenced under USSG §2R1.1 since 2006 who pleaded guilty, with a TOL of 11.  All such individuals also were in CHC I.  The average sentence was just over 3 months and the median sentence also was straight probation.  These findings are summarized in the table below, which illustrate how it is Mr. Olmstead's alcoholism and subsequent DUIs that is the overwhelming driving factor increasing his sentencing range, and not the actual bid-rigging conduct.

| Total Offense Level | Sentencing Range in CHC I | Average Sentence | Median Sentence |
|---|---|---|---|
| 13 (n=20) | 12-18 (Zone C) | 2 months | 0 |
| 11 (n=12) | 8-14 (Zone B) | 3 months | 0 |

## V.  COLLATERAL CONSEQUENCES

The collateral consequences of Mr. Olmstead's conviction will follow him for the rest of his life.  And these consequences are exceedingly numerous and onerous.  According to the American Bar Association's *National Inventory of the Collateral Consequences of Conviction*, there are at least 367 mandatory collateral federal and state consequences of a felony conviction in the State of California alone.  *See* American Bar. Assoc., Nat'l Inventory of the Collateral Consequences of Conviction, California available at http://www.abacollateralconsequences. org/search/ ?jurisdiction=10.[5]  These consequences range from preclusion for certain federal loans, to employment and licensing restrictions.

## VI.  ALTERNATIVES TO INCARCERATION

Mr. Olmstead is a well-qualified candidate for an split-sentence, which not only eliminates unnecessary cost, but will provide Mr. Olmstead with the opportunity to continue his therapy for full and effective rehabilitation.  It will also allow him to endeavor to make the community whole through substantial community service.  As the Commission recognizes,

> Effective alternative sanctions are important
> options for federal, state, and local
> criminal justice systems.  For the
> appropriate offenders, alternatives to
> incarceration can provide a substitute for

---

[5] Selecting Categories: Employment, Occupational and professional license and certification, Business license and other property rights, Government contracting and program participation, Government loans and grants, and Government benefits; Types: "Mandatory/Automatic"; and Offenses: "Any felony."

> costly incarceration.  Ideally, alternatives also provide those offenders opportunities by diverting them from prison (or reducing time spent in prison) and into programs providing the life skills and treatment necessary to become law-abiding and productive members of society.

U.S. Sentencing Comm'n, *Alternative Sentencing in the Federal Criminal Justice System* at 20 (2009) available at: http://www.ussc.gov/sites/default/files/pdf/ research-and-publications/research-projects-and-surveys/alternatives/ 20090206_Alternatives.pdf.  Encouraging the use of alternatives to incarceration remains a priority for the Commission.  *See* U.S. Sentencing Comm'n, *Proposed Priorities for Amendment Cycle Ending May 1, 2017*, Priority No. 3 ("Continuation of its study of approaches to encourage use of alternatives to incarceration, including possible consideration of amending the Sentencing Table in Chapter 5, Part A to consolidate and/or expand Zones A, B, and C, and any other relevant provisions in the Guidelines Manual.").

**CONCLUSION**

According to Mr. Olmstead's psychiatrist Dr. Masaru Fisher, who has been seeing him monthly since 2014,

> Mr. Olmstead is pained by his past poor decision making and generally has psychologically responded to the events with appropriate levels of guilt, sadness and anxiety without noted denial or dismissal. He has exhibited and continues to exhibit appropriate levels of remorse and culpability of his actions.

Masaru Fisher, M.D., Confidential Psychiatric Diagnostic

Evaluation and Report at 6 (Doc. 46 at 6).

As Dr. Fisher also observed, "Mr. Olmstead is genuinely

remorseful and takes appropriate responsibility for his illegal

actions and their consequences."  Letter by Masaru Fisher, M.D.

(Doc. 44-1 at 1).  He is "fully engaged in accepting

responsibility and doing the necessary work to better himself and

contribute to his community. . . . His goal is to take the proper

steps to ensure his behavior is never repeated."  *Id.*  In his

follow-up report of July 12, 016, Dr. Fisher adds:

> In my last report I concluded that Mr. Olmstead is
> genuinely remorseful and takes appropriate
> responsibility for his illegal actions and their
> consequences. This conclusion remains.  There are
> many psychological underpinnings which had
> influenced some of his decision making, but
> ultimately, he clearly has reported that any final
> choices he has made were his and his alone.

> We are in the process of both addressing the
> factors which most strongly influence his judgment
> and decision making as well as identifying and
> targeting barriers to him 'using his best
> judgment'.  During our last session, it was
> solidified that ongoing care and commitment to
> proper management of his substance/alcohol use is
> crucial.  We first reviewed his state of mind
> during the 2008-2009 years when his judgment was
> clouded and impaired.  Low self-esteem and in the
> midst of a physiological drug addiction added to
> fantasies of gains of which contributed to his
> poor choices.  Ironically, the relatively small
> financial gain was far outweighed by the eventual
> emotional and psychological cost.

> We are confronting the ongoing issues or guilt,
> frustration, shame and his openness during our
> sessions is refreshing and more than cautiously

18

1       optimistic in terms of his rehabilitation and
2       future outlook.

3              *                    *                    *

4       I will conclude that I personally take the
        judicial system very seriously and find it crucial
5       that individuals take responsibility or [sic]
        their actions and are culpable for any and all
6       illegal activities. In parallel, I also find it
        worthy to consider all the factors which have
7       influenced this behavior and allow room for growth
        and rehabilitation.
8

9       Attorney Matthew R. Nutting, a long-time friend of Mr.

10  Olmstead, also writes that "Mr. Olmstead takes full

11  responsibility for his role."  In his opinion, Mr. Olmstead:

12      Slipped into this mess only because of his
        severe drug and alcohol dependence and
13      addiction, that happened to line up with an
        assault of pressure from third parties.  The
14      criminal side of this is so far out of his
        character, I question whether he had any
15      sense at the time at all or whether
        prescription drugs had total control.  I know
16      valuable lessons were learned.
        (Letter by Matthew R. Nutting (Doc. 44-1 at
17      7)).

18
        Attorney Steve Sweigart notes:
19
        Knowing how hard Danny worked trying to
20      identify the right properties to buy, I can
        only imagine the frustration he felt showing
21      up that the Stockton Courthouse auctions to
        find that they were rigged; regardless of
22      whatever efforts taken to avoid the principal
        scheme members.
23
        I will go to my grave believing that in that
24      tremendous frustration of having his tireless
        efforts thwarted and his identified
25      properties taken by the principal schemers,
        Danny had a tremendous lapse in judgment and
26      allowed himself to succumb to a mentality of
        "if you can't beat them, join them."
27

28

                                    19

Mr. Damon Fanucchi, a business associate of Mr. Olmstead's, writes: Mr. Olmstead has "acknowledge[d] and accept[ed]" his offense conduct "forthright[ly] and honest[ly]" and intends on "making things right."  Letter by Damon Fanucchi (Doc. 44-1 at 4).  Mr. Fanucchi "would not hesitate to interact with [Mr. Olmstead] in a business relationship at any time in the future." *Id.* at 5.

Mr. Olmstead is arguably the second least culpable of all offenders sentenced under USSG §2R1.1 in this case, and certainly had, at most, a minor role in the conspiracy.  For all this, he received no more than $29,687.34 from his offense conduct, and perhaps even less.

He fully accepts responsibility for his crime as evidenced by his early departure from the conspiracy and immediate and continuing cooperation with the government.

Pursuant to USSG §5C1.1, Comment. (n.(6)),[6] a split sentence of five months' imprisonment followed by supervised release with

---

[6] Application Note 6 to USSG §5C1.1 provides:

> There may be cases in which a departure from the sentencing options authorized for Zone C of the Sentencing Table (. . . must be satisfied by imprisonment) to the sentencing options authorized for Zone B of the Sentencing Table (under which all or most of the minimum term may be satisfied by intermittent confinement, community confinement, or home detention instead of imprisonment) is appropriate to accomplish a specific treatment purpose.  Such a departure should be considered only in cases where the court finds that (A) the defendant is an abuser of narcotics, other controlled substances, or alcohol, or suffers from a significant mental illness, and (B) the

a special condition of five months' home confinement and successful completion of a comprehensive alcohol addiction treatment program including close supervision and testing is sufficient but not greater than necessary to meet the purposes of sentencing.

Ultimately, a split sentence is quite significant when compared to similarly situated offenders, and still sufficiently accounts for Mr. Olmstead's offense conduct and criminal history.

Dated: September 6, 2016

Respectfully Submitted,
Law Offices of Alan Ellis

/s/ *Alan Ellis*_____

By: Alan Ellis
Mark H. Allenbaugh

Carl Faller

Attorneys for Defendant
Walter D. Olmstead

---

defendant's criminality is related to the treatment problem to be addressed. (Emphasis added).

21

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6 day of September, 2016, a copy of the foregoing was served electronically via this Court's CM/ECF system on all parties.

/s/ *Alan Ellis*_____
Alan Ellis